Robert M. Herz
Law Offices of Robert Herz
431 W. 7th Avenue, Suite 107
Anchorage, Alaska 99501
Tel: 907-277-7171
Email: rmherz@gci.net

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| United States of America, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | Case No. 3:25-cr-00035-SLG-KFR |
| vs. | ) ) | |
| Jeffrey Sponsler, | ) ) | |
| Defendant. | ) ) | |

**MEMORADUM IN SUPPORT OF PRE-TRIAL RELEASE AND IN OPPOSITION TO THE GOVERNMENT'S REQUEST FOR PRE-TRIAL DETENTION**

Comes now, Jeffrey Sponsler, by and through the Law Offices of Robert Herz, P.C. and Attorney Robert M. Herz and hereby files this memorandum in support of pre-trial release and in opposition to the Government's request for pre-trial detention.

**APPLICABLE LAW**

The legislative history of the Bail Reform Act notes that "there is a small but identifiable group of *particularly dangerous* defendants as to whom neither the imposition of stringent release conditions nor the prospect of release can reasonably assure the safety of the community or other persons. It is with respect to this *limited group* of offenders that the courts must be given the power to deny release pending trial." (emphasis supplied). S.Rep. No. 225, 98th Cong., 1st Sess. 6-7 1983) reprinted in 1984 U.S. Code Cong. Ad. News 1,9 (Supp. 9A). Dr. Sponsler is not in this limited group of alleged offenders. He neither presents

an objective and actual danger to the community and he does not present a risk of failing to appear for trial.

**Factors To Weigh**

The factors the court is to consider in a detention hearing are set forth in 18 U.S.C. 3142(g) and include the nature of the offense, the weight of the evidence, the history of the defendant and his characteristics, mental and financial condition, family and community ties, criminal history, record of appearances in court, probation or parole status in any, and nature of the danger posed to the community if the defendant is released. The government has only addressed the nature of the offense, the weight of the evidence and danger posed to the community. The Ninth Circuit has held that weight of the evidence is the least important factor because the court cannot make a pre-trial determination of guilty. *U.S. v. Motamedi*, *supra*, 767 F.2d at 1408. Conditions of release need not *guarantee* safety or presence but need only "reasonably assure" both. 18 U.S.C. 3142(e); *United States v. Fortna*, 769 F.2d 243 (5th Cir. 1985); *United States v. Orta*, 760 F.2d 887 (8th Cir. 1985)(en banc).

**Procedure**

The defense as well as the government can proceed by way of proffer at a detention hearing, but not as a matter of right, but rather at the court's discretion. If the court has concerns about the accuracy or reliability of the proffer, including any of the hearsay presented, the court can require the party to present witnesses or documents. *United States v. Cardenas*, 784 F.2d 937 (9th Cir. 1986); *United States v. Acevedo-Ramos*, 755 F.2d 203, 207-208 (1st Cir. 1985). This case does not involve the rebuttable presumption articulated in 18 U.S.C. 3142(e).

**Burden Of Proof**

The burdens of proof that the government must overcome to justify detention is that the government must show the defendant presents a flight risk by a preponderance of

evidence, but must establish danger to the community by clear and convincing evidence. *United States v. Motamedi,* 767 F.2d 1403 (9th Cir. 1985).

*Dangerousness.* Clear and convincing evidence means proof that a particular defendant *actually* poses a danger, not that the defendant in theory poses a danger. *United States v. Patriarca*, 948 F.2d 789 (1st Cir. 1991). Mere possession of material involving minors is insufficient to find that the defendant poses a threat to the community. *United States v. Friedman*, 837 F.2d 48 (2d Cir. 1988); *United States v. Byrd*, 969 F.2d 106 (5th Cir. 1992). Evidence of danger must be quantifiable and objective. *United States v. Motamedi, supra,* at 1407. As noted by the Acevdeo-Ramos court the bail statute provides that the courts can detain allegedly dangerous persons — those whose release puts at *serious risk* "the safety of any other person [or] the community," (cite omitted) and only if the finding of dangerousness is "supported by clear and convincing evidence." *United States v. Acevedo-Ramos* at 207-208.

*Risk of Flight.* The *ability* to flee is insufficient to justify detention. *United States v. Himler*, 797 F.2d 156 (3d Cir. 1986). Risk of flight must be "unusually great" or present "exceptional flight risk" to justify detention. *Acevedo-Ramos* at 207-208 citing *United States v. Abrahams*, 575 F.2d 3 (1st Cir 1978.); *United States v. Melville*, 306 F. Supp. 124, 127 (S.D.N.Y. 1969).

**Factors the Court Should Consider**

*The history and characteristics of the defendant.* Dr. Jeff Sponsler, a board-certified neurologist practicing in the Matanuska-Susitna Valley. He was born in West Virginia in 1958. He obtained a BA in Biology and a MS in Computer Science at WVU. He worked as a software engineer for seven years, and then transitioned to WVU School of Medicine graduating in 1999. After completing a Neurology Residency and an Epilepsy Fellowship, he established his practice at the Alaska Brain Center in 2004 which operates to the present time.

He is on staff Mat-Su Regional Medical Center. He is the only full time Neurologist in the Valley and at the hospital. Dr. Sponsler works 7 days per week rarely taking holidays or vacations. He is on the Stroke management committee and is the Director of the in-patient epilepsy test program. He visits the ER and the ICU on a daily basis to provide Neurology care. At his clinic he has a staff of 12 professionals including a nurse practitioner. The clinic also is a Certified Sleep Clinic and provides sleep care.

He and his wife adopted two children in 2007 and they are both doing well and are married and are in college now. He pays for his daughter's college, his son's college, and daughter-in-law's college tuition as her parents could not afford that. Dr. Sponsler owns Mat Valley Dance an award-winning dance school, and he plays piano at Wasilla Community Church when he gets a Sunday free. As the court can see Dr. Sponsler has deep family and community ties and has been in the community for over twenty years.

Dr. Sponsler plays an essential and irreplaceable role in the delivery of neurological care in the Mat-Su region. He is the only full-time, board-certified neurologist on staff at Mat-Su Regional Medical Center who takes calls seven days per week for emergency department and ICU consultations. He runs the state's only in-patient epilepsy monitoring program. Before his arrival in Alaska, all complicated seizure patients had to be transferred out of state, often to Seattle. He has maintained this essential program without interruption since 2007.

The following numbers—pulled from his office's database—reflect the scope and gravity of the services he provides:

- **In the past year (Apr 2024–Apr 2025):**
    - 448 new patients seen in his neurology clinic
    - 395 electroencephalography (EEG) tests performed
    - 490 hospital consultations, including:
        - 58 Emergency Department consults

- 232 hospital stroke/seizure consults
- 200 ICU consults
- **Weekly average:**
    - 50 patient visits at Alaska Brain Center
    - 25 patient visits at Mat-Su Regional
    - **Total: 75 patient visits per week, ~3,750 per year**
    - **Over 10 years: approximately 37,500 patient visits**

As an example, during the week ending April 8, 2025, Dr. Sponsler provided urgent seizure care for five hospitalized patients, including an urgent ICU consultation on a Saturday night. These cases required immediate interpretation of EEG data—a specialized skill that only neurologists can provide. Without his availability, these patients would have received substandard care or would have been transported elsewhere at considerable delay and cost. Importantly, there are no other full-time neurologists providing hospital care in the Valley. A few part-time neurologists work in the area, but none take hospital calls, and none have the credentials or privileges to operate the seizure testing unit. Should Dr. Sponsler lose his consulting privileges due to incarceration, this essential care—including all in-patient epilepsy testing—would cease entirely. Stroke, seizure, and coma patients at Mat-Su Regional would be left without any neurologist.  Dr. Sponsler's immediate release plan is to post $50,000 cash to assure his appearance, and be placed on 24/7 house arrest with a GPS monitoring device. But given the vital nature of his medical practice he does not want to waive modifying his conditions of release at a later time to allow him to leave home for work purposes, subject to monitoring.  When he has developed an appropriate release plan to incorporate work he will file this request with the court.

      Dr. Sponsler has no criminal history, and no history of failing to appear for court, he has no current or previous probation or parole status.  His mental status is normal, he has no

history of mental illness, and he has no history of alcohol or substance abuse. Financially he is stable and secure, but far from wealthy. Posting $50,000 cash would be "uncomfortable" but is feasible. Most of his assets are illiquid.

*Risk of Flight.*

The government notes that Dr. Sponsler has travelled internationally. What the government omits is that his last international travel was over 10 years ago, and it was to Switzerland to deliver a paper at a conference. Also, it should be apparent his travel does not consist of visiting countries, such as Thailand, which have sordid sexual reputations. The government speculates that the doctor has an excess of wealth with which to flee, but the government has no facts to back up that speculation. Dr. Sponsler is more than willing to turn over his passport to the court for safe keeping for the pendency of this case which should alleviate any concern about Dr. Sponsler leaving the country. As noted earlier, the *ability* to flee is not a sufficient basis for ordering detention. And as noted, the doctor has strong ties to the community, not to any foreign country, which militates against any finding that he might flee.

*Nature of the offense*: The government alleges possession of images of child porn. The government does not allege any hands-on offense, and has not identified any victims. Yet, the government speculates that the defendant could possibly, maybe, engage in this type of conduct. The government suggests this without a shred of credible evidence. While possession of child porn is categorized as a crime of violence, in the colloquial sense, no violence was used or attempted in this case. The government alleges possession of images numbering in the hundreds. This would be the low end of the spectrum in a case like this where the median number of images typically is over four thousand. United States

Sentencing Commission, *Federal Sentencing of Child Pornography Non-Production Offenses,* June 2021 (hereinafter "2021 Commission Report").[1]

      Dr. Sponsler is charged with a single count of possession of child pornography. While a serious offense, this kind of offense does not mean Dr. Sponsler presents a serious risk to the public or community if he is released. Despite popular opinion to the contrary, quality, peer reviewed academic articles have concluded many times that individuals that consume internet child pornography pose little or no risk of committing more serious hands-on sexual offenses, have very low recidivism rates, and do very well in treatment and on supervision.

      As an example of such studies, a 2009 Swiss study of men charged with possession of child pornography concluded: "consuming child pornography alone is not a risk factor for committing hands-on sex offenses … ." See, Endrass, J., Urbaniok, F., Hammermeister, L.C., Benz, C., Elbert, T., Laubacher, A., and Rosseger, A., (2009). The Consumption of Internet Child Pornography and Sex Offending. **BMC Psychiatry**, 9-43. In another study involving more than 7000 offenders the authors found a distinct group whose only sexual crime involved illegal possession of child pornography, and that online offenders rarely go on to commit contact sexual offenses, and further found the online offenders with no history of contact offenses almost never committed contact sexual offenses. See, Seto, M.C., Hanson, R.K. & Babchisin, K.M. (2011). Contact Sexual Offending by Men with Online Sexual Offenses. **Sexual Abuse: A Journal of Research and Treatment**, 23 (1), 124-145. See also, Webb, L., Craissasti, J. & Keen, S. (2007). Characteristics of Internet Child Pornography

---

[1] "Facilitated by advancements in digital and mobile technology, non-production child pornography offenses increasingly involve voluminous quantities of videos and images that are graphic in nature, often involving the youngest victims. In fiscal year 2019, non-production child pornography offenses involved a median number of 4,265 images, with some offenders possessing and distributing millions of images and videos. Over half (52.2%) of non-production child pornography offenses in fiscal year 2019 included images or videos of infants or toddlers, and nearly every offense (99.4%) included prepubescent victims." 2021 Commission Report at 4 & 68.

Offenders: A Comparison with Child Molesters.  **Sex Abuse**, 19, 449-465. (Internet offenders pose a very low risk of sexual recidivism, and performed very well in treatment and on supervision.).  Based on the nature of the charges in this case, Dr. Sponsler poses little risk to the general public or the community if he is released with appropriate release conditions in place.

*Internet Access during pre-trial release.* A blanket prohibition against computer access by defendants *convicted* of child pornography who are on supervised release violates due process.  *U.S. v Riley*, 576 F.3d 1046, 1049 (9th Cir. 2009)("the condition is impermissibly overbroad, imposing a far greater deprivation of liberty than reasonably necessary to achieve legitimate goals of supervised release").[2]  Any supervised release condition restricting computer access must be narrowly tailored. *U.S. v. Lacoste*, 821 F.3d 1187, 1192 (9th Cir. 2016).

Here of course, Dr. Sponsler, is not convicted of any crime and is not on supervised release. An accused on pre-trial release has more rights than a probationer. *U.S. v. Scott*, 450 F.3d 863 (9th Cir. 2005).  In that regard, Dr. Sponsler calls the court's attention to *Packingham v. North Carolina,* 137 S.Ct. 1730 (2017).  North Carolina passed a statute making it a felony for registered sex offenders to gain access to any social networking websites that allowed minors to have web pages.  Mr. Packingham posted something on his Facebook page about a traffic ticket he received.  A police officer found the post and arrested Packingham for violating the statute.  A North Carolina appeals court found the statute unconstitutional, and North Carolina Supreme Court reversed, saying that the law was "carefully tailored . . . to prohibit registered sex offenders from accessing only those Web sites that allow them the opportunity to gather information about minors." Id. at  1735. The

---

[2] Indeed, imposition of such a condition, even when not objected to by defense counsel at sentencing, will be vacated for plain error. See, *U.S. v Blinkinship*, 606 F.3d 1110, 1123 (9th Cir. 2010).

United States Supreme Court reversed, noting that it can be assumed that a narrower prohibition would be okay – one that involved contacting a minor or using the internet to gain information about a minor.  However, the Court observed that a prohibition that keeps offenders from visiting Facebook or Twitter means that "North Carolina with one broad stroke bars access to what for many are the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge. . . ."  In sum, to foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights." Id. at 1737.  The Court further noted that: "It is well-established that, as a general rule, the Government 'may not suppress lawful speech as the means to suppress unlawful speech.' (Cit. omitted.)" Id. at 1738. The Court held that this was a first amendment violation.  The restriction in *Packingham,* which applied only to convicted felons, was a narrower restriction than the one proposed here by the government, which not would only deprive Dr. Sponsler of internet access, but actually keep him incarcerated for the express purpose of preventing any internet access.  Impliedly in these internet cases, and in the context of pre-trial defendants, preventing internet access cannot be a basis for detention.  Dr. Sponsler of course has not been convicted of anything.  It should be clear that a blanket ban in this case, not to mention detention for the purpose to restrict internet access, is an impermissible burden on Dr. Sponsler's first amendment rights.

Similarly, in *Doe v. Harris,* 772 F.3d 563 (9th Cir. 2014), California had passed a statute requiring all sex offenders to provide a list of all their internet identifiers and a list of all ISP's they used.  They also had to send written notice to law enforcement within 24 hours of changing an identifier or an ISP account.  Plaintiffs in *Doe* were sex offenders, all of whom had fully executed sentences, and a sex offender advocacy group who moved for a preliminary injunction against enforcement of the statute based on first amendment

grounds. They claimed that the law violated their rights to freedom of speech and assembly. The trial court granted the injunction and Ninth Circuit affirmed ruling. The circuit court noted that such a rule might be valid if were imposed on probationers or parolees. It noted that parole and supervised release are closer to incarceration than probation is, but that in both cases the state can deprive the offender of "some freedoms enjoyed by law-abiding citizens." Id. at 571. However, the court noted that these plaintiffs were no longer on supervised release as their sentences were fully executed. Although they had to comply with certain reporting requirements, they were "no longer on the 'continuum' of state-imposed punishments." Therefore, they were entitled to the full protection of the first amendment. Id. at 571. Although law did not bar speech, it significantly burdened it. And "online speech stands on the same footing as other speech – there is 'no basis for qualifying the level of First Amendment scrutiny that should be applied' to online speech. (Citation omitted.)" Id. at 574. The idea the government proposes that this court should incarcerate someone to prevent their access to the internet should offend the sensibilities of the court. Dr. Sponsler does not object to Pre-Trial Services monitoring his internet usage.

## ARGUMENT

The government's memorandum is rife with conjecture and hyperbole. If Dr. Sponsler is the danger described, surely the government would have identified a victim by now. The government notes several times that Dr. Sponsler possesses nothing clearly illegal (except apparently in two state jurisdictions), so it seems like this case depends primarily on two things: the testimony of a witness who is known to the doctor, and the government's ability to prove that he converted something legal into something illegal.

The search that resulted in seizure of media devices in this case occurred almost three months ago. The doctor has made no attempt to contact the witness. So, there is no conduct that could be described as making threats or engaging in intimidation or obstruction to support

an allegation of dangerousness. And having been on notice for almost three months of potential serious federal felony charges that could be filed, he has made no attempt to flee the jurisdiction.

The most bold statement offered by the government to the effect of "...meta-data points to Dr. Sponsler as the creator of his child pornography slideshows," is, in the opinion of one well known, federally qualified forensic computer expert, no more compelling evidence than the dress found hanging in the combination storage area/home office.[3]

This consulting expert also finds the suggestion that Dr. Sponsler's Computer Science degree would aid him in committing crimes while on release "to be silly." The only encryption found was Microsoft's built-in file system encryption. This expert likens this to a "literally 'paint-by-numbers' equivalent of art or the minigolf equivalent of golf." If the government's meta-data claims are true, then Dr. Sponsler's computer skill should not be of any concern to anyone. Interestingly, the government has not bypassed the BitLocker encrypted hard drive, the one universally believed to have a backdoor. When the government does it will find nothing incriminating, but importantly, Dr. Sponsler could have used something much better for encryption. And, had he used *any* quality encryption on his other media, apparently there would not have been an arrest based on the rest of what the government found. In the opinion of this expert, so far, the government has not described a "slam-dunk."

## CONCLUSION

The government has failed to carry its burdens of proving that Dr. Sponsler is a flight risk or a danger to the community. This court should order his release with the posting of

---

[3] The dress was a gift from Dr. Sponsler's mother to her then six-year-old daughter. It is a family heirloom, and hangs in the storage area, along with an extra bed piled with junk, a fan, and a camera tri-pod. There is nothing nefarious about this.

$50,000 cash to the Clerk of the Court, along with his passport, and on the condition that he remain on 24/7 house arrest with electronic GPS location monitoring (subject to filing for a modification to allow the doctor to work if appropriate conditions are proposed), and with Pre-Trial Services monitoring his Internet usage.

DATED at Anchorage, Alaska, this 9th day of June 2025.

THE LAW OFFICES OF ROBERT HERZ, PC

s/ Robert M. Herz
431 W. 7th Avenue, Suite 107
Anchorage, Alaska 99501
Tel: 907-277-7171
Email: rmherz@gci.net
AK Bar No. 8706023

**CERTIFICATE OF SERVICE**
I hereby certify that on June 9, 2025, a copy of the foregoing Memo in Support of Pre-Trial Release was served electronically on Assistant United States Attorney's Office     s/ Robert Herz